**The below described is SIGNED.**

**Dated: September 30, 2014** 

**R. KIMBALL MOSIER
U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 12-26343 |
| Jerry Coates and Dedra Coates, | Chapter 7 |
| Debtor. | |
| All Trades Temporary Services, LLC, | Adversary Proceeding No. 12-2317 |
| Plaintiff, | Judge R. Kimball Mosier |
| vs. | |
| Jerry Coates and Dedra W. Coates, | |
| Defendants. | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding stems from a contractual relationship that deteriorated during the

depths of the Great Recession. According to the complaint filed by Plaintiff All Trades Temporary

Services, LLC, the Defendants, Jerry and Debra W. Coates,[1] entered into a promissory note with All Trades in 2007. The note obligated All Trades to make payments to the Coateses, who were in turn obligated to make payments on an underlying note. While All Trades fulfilled its responsibilities, the Coateses failed to complete payments on the underlying note as their business, C.C. Tile & Remodeling, Inc., endured financial distress.

The Coateses filed a voluntary petition under chapter 7 of the Bankruptcy Code on May 16, 2012. All Trades initiated this adversary proceeding on August 13, 2012 by filing a complaint alleging causes of action under 11 U.S.C. § 523[2] and § 727.[3] The parties subsequently stipulated to dismiss the § 727 cause of action, and the Court entered an order to that effect on September 5, 2013.

The parties proceeded to trial on the § 523(a)(6) cause of action. The Court conducted a trial, and after receiving evidence, considering the arguments of counsel, thoroughly reviewing the pleadings of both parties, and engaging in an independent research of applicable law, the Court ruled in the Defendants' favor, issuing its findings of fact and conclusions of law from the bench. The Court expressly reserved the right to supplement its oral ruling with additional findings of fact and

---

[1] Mrs. Coates's name is spelled "Dedra" on the docket, but this appears to be a clerical error derived from the Coateses' bankruptcy petition, which used that spelling. When she took the stand at trial, Mrs. Coates spelled her name "Debra." The Court will follow the spelling as given by Mrs. Coates at trial.

[2] The complaint did not specify which provision All Trades was relying on, but as the case progressed, it became clear that All Trades was seeking nondischargeability under § 523(a)(6). The pretrial order, which memorialized the proceedings of the pretrial conference of March 24, 2014, confirmed that All Trades was proceeding against the Coateses under § 523(a)(6) for "causing willful and malicious injury to Plaintiff." Docket No. 29, at 2.

[3] All subsequent statutory references are to Title 11 of the United States Code unless otherwise indicated.

2

conclusions of law without changing its final judgment. In accordance with that oral ruling, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[4]

## I.  JURISDICTION AND VENUE

The Court's jurisdiction over this adversary proceeding is properly invoked under 28 U.S.C. § 1334(b) and § 157(a) and (b). The Plaintiff's complaint seeks to except a debt from discharge, making this a core proceeding under 28 U.S.C. § 157(b)(2)(I), and the Court may enter a final order. Venue is appropriately laid in this District under 28 U.S.C. § 1409.

## II.  FINDINGS OF FACT

1. The Coateses owned property at 321 E. 2100 S., Salt Lake City, UT 84115 (the 21st South Property), which housed the offices of their business, C.C. Tile & Remodeling, Inc.

2. The Coateses entered into an agreement to sell the 21st South Property to All Trades.

3. In connection with that sale, on or about December 14, 2007, All Trades entered into an All-Inclusive Promissory Note Secured by All-Inclusive Trust Deed (the Note) as the maker with the Coateses as the holders.

---

[4] Any of the findings of fact herein are also deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law herein are similarly deemed to be findings of fact, and they shall be equally binding as both.

4. The Note was in the amount of $187,500.00 and obligated All Trades to make four quarterly payments of $30,000.00 each beginning on March 15, 2008, and a final balloon payment on March 15, 2009 consisting of the unpaid balance together with accrued interest.

5. All Trades made the payments as required by the Note.

6. At the time the Coateses and All Trades executed the Note, the 21st South Property was encumbered by a deed of trust securing a promissory note initially in the amount of $121,125.00 (the Underlying Note) in favor of Barnes Banking Company.

7. The Note required the Coateses to make monthly payments on the Underlying Note to Barnes, to keep the Underlying Note current, and to pay the Underlying Note in full upon receipt of payment in full from All Trades.

8. The Note did not require the Coateses to use the specific funds contained in the final balloon payment from All Trades to pay off the Underlying Note.

9. The Coateses did not pay the Underlying Note in full upon receipt of the final balloon payment from All Trades.

10. The Coateses used the final balloon payment from All Trades to pay certain expenses.

11. Prior to the sale of the 21st South Property to All Trades, the Coateses had made an offer, which was subsequently accepted, to purchase property located at 3410-3426 S. 300 W., Salt Lake City, UT 84115 (the Tile Mile Property).

12. The purchase price for the Tile Mile Property was $1,350,000.

13. The Coateses put $300,000 down on the Tile Mile Property.

14. At the time the Coateses made the offer on the Tile Mile Property, five buildings stood on the property. One was structurally sound and the Coateses planned to use it as office space. The

Coateses planned to tear the other four buildings down and construct two new buildings, one of which would house a fabrication shop and the other a showroom.

15. The Coateses had planned to pay for the acquisition and improvement of the Time Mile Property with a loan from Barnes and the Utah CDC, the Small Business Administration lender in Utah.

16. The Coateses believed that Barnes and the Utah CDC would approve the loan. They also believed that approval of the loan would take two to three months because testing had to be done before approval could be granted.

17. In preparation for the acquisition and improvement of the Tile Mile Property, the Coateses made deposits for soil tests, water tests, and an asbestos inspection. The Coateses also hired an architect and engineer to draw up the plans for the Tile Mile Property, which were submitted to city authorities. The Coateses paid $110,000 from their personal funds to Atlas Architects, Inc. for its services.

18. The Coateses believed that they would be reimbursed for the deposits and the payment to the architect through the loan from Barnes and the Utah CDC.

19. Atlas Architects completed its specifications for the Tile Mile Property on April 11, 2008.

20. In preparation for building the fabrication shop, in March 2008 the Coateses obtained a quote from Park Industries for the purchase of four or five fabrication machines, which the Coateses intended to purchase.

21. After obtaining the quote from Park Industries, the Coateses made a $60,000 down payment in approximately April 2008. As before, the Coateses made this down payment from their personal funds and believed that they would be reimbursed for that cost through the loan.

22. The fabrication shop required a water reclamation system, and the Coateses made a $10,000 deposit toward that system. As before, the Coateses paid the deposit from their personal funds and believed that they would be reimbursed for that cost through the loan.

23. In preparation for the construction on the Tile Mile Property, on April 18, 2008 the Coateses filed, through Atlas Architects, a building permit application with South Salt Lake City.

24. In preparation for the demolition and construction on the Tile Mile Property, the Coateses entered into negotiations with Roger Knight Construction to employ its services as a general contractor. On May 14, 2008, the Coateses received a bid from Roger Knight Construction to complete the work on the Tile Mile Property.

25. At the request of Barnes, an appraisal of the Tile Mile Property was prepared by Bodell-Van Drimmelen, dated August 29, 2008.

26. With all preparatory work needed to obtain the loan completed, the Coateses waited for the loan to be approved. Then, in fall 2008, Barnes indicated that all of its construction and commercial loans were on hold.

27. The Coateses contacted other banks in an attempt to obtain the loan for the Tile Mile Property.

28. Based on the verbal conversations that they had with the bankers at those banks and with the Utah CDC, the Coateses felt confident that they would be able to find a bank to replace Barnes.

29. When the Coateses received the final balloon payment from All Trades, they and C.C. Tile were experiencing financial difficulty and problems with cash flow. C.C. Tile's reported gross receipts of $1,080,420 on its 2008 tax return, which declined to $669,557 in 2009, and declined further to $390,841 in 2010.

30. When the Coateses received the final balloon payment, the believed that they would get a loan approved, but they were aware that they may not get a loan approved.

31. Mark Fassett, the Chief Financial Officer of All Trades, attempted to contact the Coateses by telephone after All Trades made the final balloon payment in an attempt to discern why All Trades had not received clear title to the 21st South Property.

32. In July 2009, Jerry Coates called Fassett and informed him that he was having cash flow problems.

33. As of March 2009, C.C. Tile was able to pay its bills.

34. As of March 2009, the Coateses remained confident that they would be able to get a loan for the Tile Mile Property, and they continued to try to find a replacement lender for Barnes.

35. The Coateses were ultimately unsuccessful in finding a replacement lender for Barnes.

36. In 2009, the Coateses listed the Tile Mile Property for sale, believing that if the property were sold, they could recoup the $300,000 down payment as equity and pay off the Underlying Note.

37. The attempts to sell the Tile Mile Property were unsuccessful.

38. The Coateses refinanced the Underlying Note on July 2, 2009, which provided a new maturity date of June 15, 2019.

39. At the time of the refinance, Barnes informed the Coateses that it was not funding any additional commercial loans.

40. The Coateses stopped paying themselves salaries from C.C. Tile in 2008.

41. In 2009, Debra Coates withdrew $96,254.05 from her IRA, and Jerry Coates withdrew $38,443.27 from his IRA.

42. The Coateses liquidated personal assets, including a fifth wheel, two unencumbered vehicles, all of their jewelry, their wedding rings, and Jerry Coates's grandparents' wedding rings.

43. The Coateses used the funds from their IRAs and the proceeds from the liquidated assets to pay for their personal expenses and to keep the Underlying Note current.

44. The Coateses reduced staffing at C.C. Tile.

45. The Coateses liquidated unessential machinery and tools belonging to C.C. Tile.

46. In response to a demand from All Trades to pay the Underlying Note in full, the Coateses wrote a letter in response in April 2010 stating that they were current on the Underlying Note, but were unable to pay it off at that time.

47. Barnes failed and went into receivership in 2010.

48. At the start of 2011, the Coateses did not have any money to pay the Underlying Note.

49. Between March 2009 and January 2011, the Coateses had paid down the principal on the Underlying Note by approximately $20,000.

50. All Trades did not discover that the Coateses were not paying the Underlying Note until 2012.

51. In August 2012, All Trades was informed that Gravity Segregation II, LLC owned the 21st South Property and that it was going to initiate foreclosure proceedings.

52. On September 27, 2013, All Trades eventually paid Gravity Segregation $108,499.70 to pay off the Underlying Note.

### III.  CONCLUSIONS OF LAW

The Supreme Court has recognized that a "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their

creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[5] The discharge afforded by the Code is at the heart of this fresh start policy.[6] Nevertheless, a fresh start is available only to the "honest but unfortunate debtor."[7] To this end, Congress has provided that debtors who engage in certain conduct will have particular debts excepted from discharge under § 523 or will be denied a discharge of their debts in toto under § 727.[8] These statutory provisions evince Congress's policy determination that "certain interests outweigh the 'fresh start' for the debtor."[9] Nevertheless, "exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[10]

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[11] Because "willful" and "malicious"

---

[5] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[6] *See* H.R. Rep. No. 95-595, at 384 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6340.

[7] *Grogan*, 498 U.S. at 286–87 (quoting *Local Loan Co.*, 292 U.S. at 244); *see also Standiferd v. U.S. Trustee*, 641 F.3d 1209, 1212 (10th Cir. 2011) ("[T]he opportunity for 'a completely unencumbered new beginning' is reserved only for 'the honest but unfortunate debtor.'"); *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) ("[A] discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor.").

[8] Some debts are excepted from discharge not because the debtor incurred them through dishonest means, but because they are of a certain character. For example, Congress has provided that domestic support obligations cannot be discharged in bankruptcy. *See* § 523(a)(5).

[9] *Taylor v. Taylor (In re Taylor)*, 737 F.3d 670, 675 (10th Cir. 2013) (citing *Grogan*, 498 U.S. at 286–87).

[10] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (citation omitted).

[11] § 523(a)(6).

are joined in the conjunctive, a plaintiff must prove both to render a debt non-dischargeable under this provision,[12] and the burden of proof is by a preponderance of the evidence.[13] The willfulness component requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[14] A plaintiff must therefore prove that the debtor "'desire[s] to cause the consequences of his act or believe[s] that the consequences are substantially certain to result from it.'"[15] The inquiry in this regard is subjective, focusing on the state of mind of the debtor.[16]

While *Geiger* definitively resolved the standard for willfulness, it did not define "malicious," and the absence of a clear standard for maliciousness has engendered disagreement among the lower courts. Some courts have read *Geiger* to join the willful and malicious prongs of § 523(a)(6) into a single standard, but this approach has not been uniform.[17] In *Moore*, one of its decisions to address § 523(a)(6) post-*Geiger*, the Tenth Circuit Court of Appeals "defined 'malicious' in terms that seem

---

[12] *See Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004); *see also Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (B.A.P. 10th Cir. 1999) ("Failure of a creditor to establish either willfulness or malice renders the debt dischargeable.").

[13] *Grogan*, 498 U.S. at 291.

[14] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also Penix v. Parra (In re Parra)*, 483 B.R. 752, 771 (Bankr. D.N.M. 2012) ("The 'willful' element requires both an intentional act and an intended harm; an intentional act that leads to harm is not sufficient.").

[15] *Moore*, 357 F.3d at 1129 (quoting *Longley*, 235 B.R. at 657).

[16] *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000) (unpublished) ("When injury was 'neither desired nor in fact anticipated by the debtor,' it is outside the scope of the statute.").

[17] *See Parra*, 483 B.R. at 772; *see also Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 879 (Bankr. D. Colo. 2004) ("There is also confusion in the case law as to whether *Geiger* has essentially collapsed the 'willful and malicious' inquiry into a unitary standard that embraces both willfulness and malice.").

equivalent to the definition of 'willful' under the *Geiger* standard."[18] Specifically, the Tenth Circuit quoted the pre-*Geiger* case of *Hope v. Walker (In re Walker)*[19] for the proposition that "'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'"[20] Defining malicious in these terms "blurs the distinction between 'willful' and 'malicious'"[21] and would essentially allow a plaintiff to kill two birds with one stone—a plaintiff could satisfy the willful and malicious elements and prove nondischargeability under § 523(a)(6) merely by showing that the defendant intentionally injured the plaintiff. This would appear to run contrary to the Tenth Circuit's holding that a plaintiff must prove both willfulness and malice, and the general rule of statutory construction that effect should be given to every word in the statute.[22]

To resolve this problem, some courts within and without the Tenth Circuit have interpreted the malice element as requiring that the defendant's injurious conduct be "performed without

---

[18] *Parra*, 483 B.R. at 772.

[19] *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir. 1995).

[20] *Moore*, 357 F.3d at 1129.

[21] *Bank of Commerce & Trust Co. v. Schupbach (In re Schupbach)*, 500 B.R. 22, 36 (Bankr. D. Kan. 2013).

[22] *See Parra*, 483 B.R. 772–73 ("[B]ecause the Tenth Circuit directs that willful and malicious are separate, distinct requirements, 'malicious' must be defined so that it is distinguishable from 'willful.'"); *Tinkler*, 311 B.R. at 879 ("[T]his Court recognizes the necessity of giving effect to the entire statute.").

justification or excuse."[23] Other courts abide by this standard but add the requirements that the act be intentional and wrongful.[24]

While All Trades argues that this case involves conversion, the Court disagrees. Under Utah law, conversion "requires 'only an intent to exercise dominion or control over the goods inconsistent with the owner's right.'"[25] Here, the Note does not state that the final balloon payment remains the property of All Trades when paid to the Coateses. The Note also does not impose a fiduciary duty on the Coateses to use the final balloon payment for a specific purpose. Because the final balloon payment funds did not belong to All Trades once the Coateses received them, the Court concludes that the Coateses did not convert those funds under Utah law.

It is undisputed that the Coateses intentionally failed to pay the Underlying Note in full when All Trades made the final balloon payment, as required by the Note. Instead of using that money to pay off the Underlying Note, the Coateses applied it to personal or business expenses. While this is an intentional act, it is not an intentional injury.

---

[23] *Am. First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 181 (Bankr. D. Utah 1999); *see also Stallworth v. McBride (In re McBride)*, 512 B.R. 103, 115 (Bankr. D. Mass. 2014). *But see McCain Foods USA Inc. v. Shore (In re Shore)*, 317 B.R. 536, 543 (B.A.P. 10th Cir. 2004) ("[N]either *Geiger* nor the Tenth Circuit have explicitly addressed whether a plaintiff must demonstrate that an injury occurred without just cause or excuse in a § 523(a)(6) proceeding . . . .").

[24] *See Sierra Chemicals, LLC v. Mosley (In re Mosley)*, 501 B.R. 736, 743 (Bankr. D.N.M. 2013) ("For a debtor's actions to be malicious, they have to be intentional, wrongful, and done without justification or excuse.") (Thuma, J.); *Parra*, 483 B.R. at 773 ("This Court concludes that the 'malicious' component of 11 U.S.C. § 523(a)(6) requires an intentional, wrongful act, done without justification or excuse.") (Jacobvitz, J.); *Flores v. Chlarson (In re Chlarson)*, 501 B.R. 857, 861 (Bankr. C.D. Cal. 2013) ("The relevant test for finding 'malicious' conduct is whether the evidence establishes: '(1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) is done without just cause and excuse.'").

[25] *State v. McBride*, 940 P.2d 539, 543 (Utah Ct. App. 1997) (quoting *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958)).

The evidence shows that at the time the Coateses received the final balloon payment from All Trades, they did not intend the specific injury that All Trades complains of—namely, due to the Coateses' failure to pay off the Underlying Note in full, All Trades had to incur substantial additional expense to pay off the Underlying Note and receive title to the 21st South Property. The testimony of Jerry and Debra Coates, which the Court finds credible, establishes that they intended to pay off the Underlying Note, but were unable to do so because they had made significant outlays to begin construction on the Tile Mile Property. They sincerely believed that they would obtain approval for the loan that would have allowed that construction to proceed, commensurately improving their cash flow position so that they could pay off the Underlying Note.

Moreover, the Coateses took steps that do not evince an intent to cause injury to All Trades, but rather an intent to mitigate injury. For example, when it became clear that Barnes would not be able to loan them the money for the Tile Mile Property, the Coateses sought out a replacement lender. They refinanced the Underlying Note to prevent foreclosure. They withdrew over $130,000 from their IRAs and liquidated significant personal assets and devoted a portion of those proceeds towards paying down the principal on the Underlying Note. These acts corroborate the Coateses' testimony that they intended to pay off the Underlying Note and did not intend the injury of which All Trades complains.

At bottom, the Coateses committed an intentional act that led to All Trades' injury. But such an act, without the intent to cause injury, falls outside the scope of § 523(a)(6). The Court concludes that the Coateses had neither the requisite intent to harm All Trades nor the belief, at the time they accepted the final balloon payment and failed to pay off the Underlying Note, that the harm that would befall All Trades was substantially certain to result from their failure to pay off the Underlying Note at the contractually obligated time.

In addition, the Court concludes that All Trades has not carried its burden to show that the Coateses' retention of the final balloon payment and failure to pay off the Underlying Note was malicious—i.e., without justification or excuse. The Note is silent on the issue of whether the Coateses were obligated to devote the final balloon payment funds to pay off the Underlying Note. In the absence of such an obligation, the Coateses were presumably at liberty to use whatever funds they chose to pay off the Underlying Note, so long as they paid it off when they received the final balloon payment from All Trades. The Coateses presented credible evidence that they were weathering some cash flow problems in March 2009 when All Trades made the final balloon payment, but that they believed they had funds in the offing that would allow them to pay off the Underlying Note. Based on the facts before the Court, the Coateses have presented an excuse for their failure to pay off the Underlying Note according to the terms in the Note.

## IV.  CONCLUSION

The Coateses intentionally breached their agreement with All Trades under the Note, and All Trades was eventually injured by that breach. But the Court cannot find by a preponderance of the evidence that the injury to All Trades was the result of willful and malicious actions. For that reason, the Court will enter judgment in favor of the Coateses.

_____END OF DOCUMENT_____

_____ooo0ooo_____
## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** will be effected through the Bankruptcy Noticing Center to each party listed below.

Rick L. Sorensen
HAWKINS & SORENSEN, LC
2035 S. Milestone Drive, Suite B
Salt Lake City, UT 84104
    *Attorney for Plaintiff*

Edward J. Stone
THE STONE LAW FIRM
375 South 300 West
Salt Lake City, UT 84101
    *Attorney for Defendants*